UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------X
UNITED STATES OF AMERICA,                            | 20-Cr-368 (EK)

                              v.

ALONZO SCOTT,
                                    Defendant.
-----------------------------------------------------X

## SENTENCING MEMORANDUM
## SUBMITTED ON BEHALF OF ALONZO SCOTT

Dated: April 26, 2022            Donna R. Newman
       New York, NY              Law Office of Donna R. Newman, PA
                                 20 Vesey St., Ste. 400
                                 New York, NY 10007
                                 (212) 229-1516

                                 *Attorney for Alonzo Scott*

## PRELIMINARY STATEMENT

Alonzo Scott sold drugs. He admits that he has done wrong, accepts responsibility for his actions, and is ready to face the Court's just sentence. He knows he must be punished. Yet punishment is just one of the goals of sentencing. Under 18 U.S.C. § 3553(a), a sentence should (A) reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense, (B) afford adequate deterrence to criminal conduct; (C) protect the public from further crimes of the defendant; and (D) provide the defendant with needed education or vocational training, [and] medical care. 18 U.S.C. § 3553(a)(2).

Thus, while the Court must undoubtedly consider the need to punish Mr. Scott for his admitted wrongdoing, we ask the Court also to give meaningful weight to the progress that Mr. Scott has made toward his educational goals while on pretrial release since October 2020, the support he has provided to his girlfriend and her children, the treatment programs that he has willingly attended, and the strong likelihood that, with appropriate, continued evaluation and counseling, he will be able to maintain the positive improvements he has made in his life.

Mr. Scott pled guilty to a violation of 21 U.S.C. § 841(b)(1)(C) and faces, as a result, a statutory sentencing range of 0-20 years of imprisonment. The Probation Department and the Government calculate that Mr. Scott is a career offender, resulting in an advisory Sentencing Guidelines range of 151-188 months of imprisonment. The Defense disagrees. Consistent with the carve-out in the plea agreement, the Defense concludes that Mr. Scott is not a career offender because he does not have two qualifying predicate crime of violence or controlled substance offenses. Consequently, the Defense calculates that Mr. Scott is in Criminal History Category ("CHC") VI and, at level 15, faces an advisory Sentencing Guidelines range of 41-51 months of imprisonment.

But even if the Court concludes that the career offender enhancement applies, we urge the Court to sentence Mr. Scott without application of the career offender enhancement, which has been criticized for its flaws both by the Sentencing Commission and by courts in this Circuit. We ask the Court instead, in consideration of the § 3553(a) factors, to impose a term of incarceration of no more than 24 months which would be "sufficient, but not greater than necessary," to serve each of the sentencing goals.

## HISTORY AND CHARACTERISTICS OF ALONZO SCOTT

The history that Mr. Scott is willing to share—with counsel, with Probation, and even with his close friends— is minimal. Yet, in speaking to him, and in letters from supportive friends, the scars of his past are evident. It is not hard to perceive that his reticence masks considerable emotional pain as well as a learned distrust of strangers.

Mr. Scott recalls a "normal" childhood (PSR at ¶ 38), raised by his mother in unremarkable circumstances, along with two siblings. His father was not present in the home and was not involved in Mr. Scott's life (PSR at ¶ 38). But "normal" is not a word that accurately describes Mr. Scott's early years.

Mr. Scott disclosed no details about his adolescence. His is protective of his family background and reticent about the circumstances surrounding his dysfunctional upbringing. However, his cousin Shaqueena Malagic Scott confided in counsel that mental illness runs in the family; an illness that plagued her own mother as well as Mr. Scott's mother. Shaqueena writes that Mr. Scott's  mother "kicked him out at a[n] early age, if I'm not mistaken it was at the age of fifteen through seventeen, during that time he was in between couches stairways and homeless shelters as if it wasn't bad enough, he ended up not completing his high school education."

Exhibit B, Letter from Shaqueena Malagic. Being kicked out of his home accustomed him "to a survival lifestyle." Ms. Malagic writes:

> Being that he has Dealt with homeless he ultimately did what he had to do to survive. Some of the decisions he has made in his younger life has impacted him drastically. There has been instances where he has abused and sold drugs which led him to being incarcerated young. He knew that if he was caught he would have a roof over his head as well as food.

*Id.*

This small glimpse into the turbulent circumstances of Mr. Scott's youth—his homeless and desperation—provides insight into Mr. Scott and explains why, in times of stress and despair, he turns to drugs.[1] The financial and emotional instability that he endured took a toll. As he writes in his own letter to the Court, "addiction to narcotics has altered my reasoning which led to a broad series of horrible decision which stems in my teenage years and persist through my life basically. I lived suspiciously as well as defensively for most of my life."  Exhibit A, Letter from Alonzo Scott.

During these crucial years, when he should have been completing his high school education and preparing for a law-abiding career, Mr. Scott began to abuse drugs (PSR at ¶ 45). He has a history of use of heroin, cocaine, marijuana, and alcohol (PSR at ¶ 44). Although he has participated in treatment programs, it appears that the underlying emotional cause(s) for his turn to self-medication with illegal substances and with alcohol have never been thoroughly addressed. A program of therapeutic intervention that offers Mr. Scott an opportunity to understand how repression of his teenage trauma and self-medication through substance abuse have thus far hindered his success as a law-abiding citizen appears warranted.

---

[1] To be clear, Mr. Scott does not offer this information as an excuse for his offense conduct. He blames nobody but himself for his current circumstances-his offense conduct-for which he takes full responsibility.

Mr. Scott is now 38 years old. For the past nine years, he has been in a relationship with Latoya Hill, whom he has known for over twenty years. They grew up in the same neighborhood. She writes to the Court that Mr. Scott is a role-model "father" to her 14-year-old twins. He takes his college courses "very seriously, exemplifying extraordinary grades. He's always reading or always willing to learn about any and everything." Exhibit B, Letter from Latoya Hill. He exhibits "potential, determination, dedication and drive." *Id.* Mr. Scott "is a loving kind hearted man who would like a second chance at life, and to be a father figure to my twins' [*sic*] and for us to create a life together." *Id.*

As Mr. Scott has written, he has "contributed an tremendous amount of effort toward moving beyond" his former way of life. "I have chosen to seek counseling an a routine basis(BRIDGE BACK TO LIFE[2] ) which has been center of information . It has also help me developed a sense of self- awareness which has been aiding in change of mind & heart . . . . I inspire to do better to be a better man to my family and friends, to be a better to my church to  be a remodel in the community to be a better father figure to (Latoya's) children and to be the man Latoya would love to marry  some day." Exhibit A.

Perhaps critically for the Court's sentencing determination, Mr. Scott is ready for a change and has demonstrated change. During a prior incarceration in 2015, he earned his GED (PSR at ¶ 45). He is currently enrolled in courses and actively working toward a college degree (PSR at¶ 46). He looks forward to "continuing my education upon the conclusion of the case." Exhibit A. As the Court will recall, letters in support of his release on bond attested to his strong study ethic and his desire to succeed in school. He was employed by ACT Ambulette, Inc., earning $15 per hour (PSR at ¶ 48). He worked six days a week, often 12 -hour days and never

---

[2] Counsel requested the records from Bridge Back To Life and await production.

complained. He has been substantially compliant with the terms of his release. Most importantly, he has remained drug free during his time on release. Nonetheless, he is willing to participate in drug treatment or in any counseling program that the Probation Department recommends.

As Ms. Hill writes,  "Alonzo has made many mistakes in the past that he truly regrets and repents and asks forgiveness for everyday! He just wants to start over and anew. And get back into society, work, complete his education and eventually open a business." Exhibit B, Letter from Latoya Hill.

In short, Mr. Scott stands before the Court aware that his criminal history is lengthy, and aware that the Court can sentence him to a significant term of imprisonment. He is ready to face the consequences of his actions and to rebuild his life. He is contrite and truly remorseful for his offense conduct and his failure not to seek immediate treatment, which might have helped him ride out his stress in a lawful manner. See Exhibit A. He asks the Court, in imposing sentence, to recognize the progress he has already made in all areas of his life while released on bond, writing, "I know it may appear to you that i am a career offender but contrary to the belief , i am everything but that ,and that is evident. Those tremendous strides towards change ,recovery, mental health is duly noted." Exhibit A. Further, he asks the Court for a mental health counseling recommendation: "I also still feel that mental health & drug treatment programming should be something that i should consider due to the fact that both are critical factors in reinvention and transformation of my recovery ." Exhibit A.

## LEGAL STANDARD

A sentence should be "sufficient, but not greater than necessary" to (A) reflect the seriousness of the offense, promote respect for the law and provide just punishment for the offense, (B) afford adequate deterrence to criminal conduct; (C) protect the public from further

crimes of the defendant; and (D) provide the defendant with needed education or vocational training, [and] medical care. 18 U.S.C. § 3553(a)(2). *See Kimbrough v. United States*, 552 U.S. 85, 110 (2007); *United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008).

In imposing such a sentence, a sentencing court should consider: (1) the guideline range; (2) the policy statements of the Sentencing Commission; (3) the nature and circumstances of the offense, and a history of the defendant; (4) any need for sentence to further purposes of deterrence, protective or rehabilitative functions; (5) the kinds of sentences available; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records and conduct; and (7) the need to provide restitution to the victims. 18 U.S.C.§ 3553(a); *Id.* Above all else, sentencing must be individualized. *Pepper v. United States*, 562 U.S. 476, 487–88 (2011). *See also Williams v. People of State of N.Y.,* 337 U.S. 241, 247 (1949) ("[T]he punishment should fit the offender and not merely the crime."). A sentence of 24 months for Mr. Scott would satisfy each of those goals.

## OFFENSE CONDUCT AND SENTENCING GUIDELINES

Mr. Scott was addicted to heroin. He admits that he sold heroin to two undercover agents—steady customers whose payments provided him with the funds to supply his own addiction—in a sting operation. It is for this reason that the Government agreed to let him withdraw his plea to the conspiracy count in favor of entry of a plea to the substantive count with which he was charged.[3]

Living alone, stressed by the competing demands of work and school, both of which increased exponentially due to the uncertainty and societal shutdown at the beginning of the

---

[3] See, e.g., *United States v. Sumner*, No. 08 CR. 824 DC, 2010 WL 4922537, at *4 (S.D.N.Y. Dec. 1, 2010) (referencing *United States v. Goldberg,* 756 F.2d 949, 958 (2d Cir.1985); *United States v. Barnes,* 604 F.2d 121, 161 (2d Cir.1979)) ("An individual cannot conspire with an undercover government agent alone; a third party must also participate in the joint venture.").

COVID-19 pandemic, Mr. Scott turned to heroin to escape. Although he thought he was in charge of his actions, his addiction controlled him. Mr. Scott's addiction and resulting need for money with which to purchase increasing quantities of heroin for his personal use fueled his offense conduct. Since his arrest, he has taken steps to fight his addiction, including participation in drug treatment programs under the supervision of Pretrial Services.

The PSR calculates that Mr. Scott is a career offender, in CHC VI, total offense level 29 (see PSR at ¶¶ 17, 20, 32). As a result, the PSR calculates that he faces an advisory Sentencing Guidelines range of 151-188 months (PSR at ¶ 55). This calculation is incorrect. Mr. Scott does not have two prior convictions that qualify as predicates for the application of the Career Offender Guideline, USSG § 4B1.1.

Without the career offender enhancement, Mr. Scott would be at an offense level of 18 based on the drug quantity at issue—1.24 grams of Fentanyl and 39.9 grams of heroin, the equivalent of 43 kilograms of marijuana (PSR at ¶ 11)—before acceptance of responsibility. Assuming subtraction of three points for acceptance, even in CHC VI, an offense level of 15 equates to an advisory Sentencing Guidelines range of 41-51 months of imprisonment. As explained, *infra*,  even a sentence of  41 months is overly harsh, while the requested sentence of 24 months is sufficient but not greater than necessary to meet sentencing considerations. See 18 U.S.C. § 3553(a).

## MR. SCOTT IS NOT A CAREER OFFENDER

Pursuant to USSG § 4B1.1, an individual is a career offender if he was at least 18 years old at the time of the instant conviction, the conviction is either a crime of violence or a controlled substance felony offense, and the individual has at least two prior qualifying convictions of either a crime of violence or a controlled substance offense. Although Mr. Scott is

over 18 and the instant conviction is undeniably a controlled substance offense, he does not have two qualifying predicate offenses. Thus, he is not a career offender.

The PSR discusses Mr. Scott's criminal history in some detail (PSR ¶¶ 21-29). But it does not state which offenses it believes qualify as the necessary predicate crimes to make him a career offender under § 4B1.1. The Defense therefore examines each of his prior felony convictions in turn.[4]

## I.   Mr. Scott's Prior Controlled Substance Convictions Are Not Career Offender Predicate Controlled Substance Offenses.

Mr. Scott has two New York State felony convictions for controlled substance offenses: Criminal Possession of a Narcotic Drug [crack cocaine] in the 4th Degree (PSR at ¶ 26) (violation of New York Penal Law § 220.09) and Criminal Possession of a Controlled Substance [substance unknown] in the 3rd Degree with Intent to Sell (PSR at ¶ 27) (violation of New York Penal Law § 220.16(1)). USSG § 4B1.2(b) defines a "controlled substance offense" as:

> an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the manufacture, import, export, distribution, or dispensing of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to manufacture, import, export, distribute, or dispense.

### A.   Criminal Possession of a Controlled Substance Without Intent to Sell Is Not A Career Offender Predicate.

The "simple possession of narcotics" is not a controlled substance offense within the meaning of USSG § 4B1.2(b). *See United States v. Lopez*, No. 11-CR-568 (PKC), 2021 WL 761850, at *1 (S.D.N.Y. Feb. 26, 2021) (referencing a prior conviction under 220.09 and noting that "Lopez and the government now agree that one of these predicate offenses, criminal

---

[4] The three misdemeanor convictions (PSR at ¶¶ 22, 23, and 24) are not qualifying career offender predicates because they are not "punishable by imprisonment for a term exceeding one year." USSG § 4B1.2(a) and (b); NY Pen. L § 70.15(2) (maximum term of imprisonment for a Class B misdemeanor is 3 months).

possession of a narcotic drug in the fourth degree, does not . . . constitute a 'controlled substance offense.'"); *United States v. Vargas*, No. 88-CR-325 (VEC), 2020 WL 6886646, at *4 n.2 (S.D.N.Y. Nov. 24, 2020) (simple possession "cannot be characterized as a 'controlled substance offense'"); *Romero v. United States*, 933 F. Supp. 2d 528, 532 (S.D.N.Y. 2013) ("[T]o qualify as a predicate offense under the Sentencing Guidelines, a conviction or guilty plea must include both elements of possession and intent to distribute a controlled substance."). For these reasons, Mr. Scott's conviction for Criminal Possession in the 4[th] Degree (PSR at ¶ 26), with no intent to sell, cannot be a career-offender-predicate narcotics offense.

**B.      Mr. Scott's 2006 Conviction for Criminal Possession of an Unknown Controlled Substance With Intent to Sell Is Not A Career Offender Predicate in Violation of NYPL § 220.16.**

Mr. Scott's New York State 2006 conviction for Criminal Possession of a Controlled Substance [substance unknown] in the 3rd Degree with Intent to Sell (PSR ¶ 27)  in violation of New York Penal Law, ("N.Y.P.L.") § 220.16(7) is likewise not a qualifying controlled substance career offender predicate. This conclusion is mandated because  New York Public Health Law § 220.00 (7) defines a "controlled substance" more broadly than the federal Controlled Substances Act ("CSA"), 21 U.S.C. § 802.

In *United States v. Townsend*, 897 F.3d 66, 71, 75 (2d Cir. 2018), the Second Circuit held that the term "controlled substance" in USSG § 4B1.2(b) means a substance controlled by federal law under the Controlled Substances Act ("CSA"). The *Townsend* Court explained that:

> A state conviction will qualify as a predicate offense . . . if the state conviction aligns with, or is a "categorical match" with, federal law's definition of a controlled substance. To determine whether the definition matches, we must know the state crime that was committed and compare the elements of that crime to the elements of the corresponding generic federal crime. If a state statute is broader than its federal counterpart—that is, if the state statute criminalizes some conduct that is not criminalized under the analogous federal law—the state conviction cannot support an increase in the base offense level. *See United States v. Jones*,

878 F.3d 10, 15-16 (2d Cir. 2017).

*Townsend*, 897 F.3d at 72; *see also* cases cited therein in accord with the conclusion that the "controlled substance offense" for a career offender predicate under § 4B1.2(b) is governed by the federal CSA schedules, *inter alia*, *United States v. Ruth*, 966 F.3d 642 (7th Cir. 2020); *United States v. Gomez-Alvarez*, 781 F.3d 66, 68 (5th Cir. 2015); *United States v. Sanchez-Garcia*, 642 F.3d. 658 (8th Cir. 2011); *United States v. Lead-Vega*, 680 F.3d 1160 (9th Cir. 2012); *see also United States v. Guerrero*, 910 F.3d 72, 74 (2d Cir. 2018)("Guided by our recent decision in *United States v. Townsend*, 89 F.3d 66 (2d Cir. 2018), we conclude that the phrase 'controlled substance' as used in the 2014 Guidelines definition of 'felony drug trafficking offense' refers exclusively to those substances controlled under federal law."), *cf. United States v. Ward*, 2020 WL 5014873 (4th Cir. Aug. 2020). In other words, for a state predicate narcotics offense to qualify as a predicate under the career offender guideline, "the state law must criminalize only those substances that are criminalized under federal law." *Id.*; *see also United States v. Swinton,* 495 F.Supp.3d 197 (2d Cir. 2018); *Doe v. Sessions*, 886 F.3d 203, 208 (2d Cir. 2018). This analysis requires a comparison between the state law and the federal law.

There are two possible methods for this comparison: "the categorical approach and the modified categorical approach." *Id*. at 72 (citing *Mathis v. United States*, __ U.S. __, 136 S.Ct. 2243, 2248-49, 195 L.Ed.2d 604 (2016)). As the Supreme Court has explained, the formal categorical approach (in which the sentencing court can consider only the elements of the prior offense and not the particular facts of the offense) is used where a statute is indivisible. *See Taylor v. United States*, 495 U.S. 575, 110 S.Ct. 2143, 2143, 109 L.Ed. 607 (1990). A statute is indivisible when the statute defines only one crime with "various factual means of committing the crime." *Townsend*, 897 F.3d at 73 (citing *Mathis*, 136 S.Ct. at 2249). On the other hand, a

statute that lists elements in the alternative, "thereby defining multiple crimes within one statute," is divisible and "triggers the modified categorical approach." *Id.* (citing *United States v. Jones*, 878 F.3d 10, 16 (2d Cir. 2017)).

N.Y.P.L. § 220.16 is an indivisible statute insofar as the offense represents a single offense which may be satisfied in various way—i.e., by the possession and intended sale of various drugs. *United States v. Holmes*, 21 cr 147 (NGG), 2022 WL 1036631 (April 6, 2022) (citing *Harbin v. Sessions*, 860 F.3d 58, 67 (2d Cir. 2017) & reviewing rulings of New York State courts describing §220.16 as an indivisible statute); *see also United States v. Ferrer*, 17 Cr. 773, Letter of United States at 1, ECF # 23("The Government agrees that pursuant to *Harbin v. Sessions*, 860 F.3d 58, 67 (2d Cir. 2017), ... the relevant subsection []here-the subsection [criminalizing the sale ... of [a 'narcotic drug[]'-[i]s not further divisible by type of narcotic drug."). Because N.Y.P.L. § 220.16 is indivisible the categorical approach applies. Accordingly, if and only if, there is a "categorical match" between New York's definition of narcotic drug and the federal definition of a controlled substance, does Scott's prior N.Y.P. L. § 220.16 conviction qualify as a predicate under the career offender guideline.

Under New York law, "narcotic drug" is defined as "any controlled substance listed in schedule I(b), I(c), II(b) or II(c)" of the New York Public Health Law § 3306. N.Y.P. L. § 220.00(7). Schedule II(b)(1) regulates opiates. While it excludes certain substances from regulation, it does <u>not</u> exclude the opiate derivative naloxegol.[5] Thus, a defendant could be prosecuted in New York state court under N.Y.P.L. § 220.16(1) for possession of naloxegol with intent to sell. By contrast, a defendant cannot be prosecuted federally for selling naloxegol, since a 2015 amendment to the Controlled Substances Act (CSA) expressly excluded naloxegol from

---

[5] Schedule II(b)(1) excludes apomorphine, dextrorphan, nalbuphine, nalmefene, naloxone, and naltrexone and their respective salts.

regulation. 21 C.F.R. § 1308.12(b)(1). Due to its inclusion of naloxegol, New York's definition

of "controlled substance" is not a categorical match with the CSA's definition of "controlled

substance." *Townsend*, 897 F.3d at 74. Thus, "because the New York state statute of conviction

criminalizes the sale of a substance (naloxegol) not criminalized under federal law, the state

statute does not categorically match the federal crime." *Id. see also United States v. Disla*, 20 cr

222 (S.D.N.Y.)(Hellerstein); *United States v. Butler*, 19 cr 177 (S.D.N.Y.)(Daniels, J); *United*

*States v. Santana*, 18 cr 865 (Caproni, J); *United States v. Augustine*, 17 cr 753 (S.D.N.Y)

(Seibel, J.); *United States v. Swinton*, 2020 WL 6107054 (W.D.N.Y. l Oct. 15, 2020); *United*

*States v. Gibson*, 19 cr 66 (W.D. N.Y.); *see also United States v. Gibson*, No. 20-3049 (2d Cir.)

(argued Nov. 23, 2021) at ECF No. 27 (Brief for the United States of America, , at 6 n.2

[conceding that "[A] 2015 amendment to the Controlled Substances Act ("CSA") removed

naloxegol as a federally controlled substance, rendering New York State Penal Law §

110/220.39-1 broader than its federal counterpart."]).[6]

   *Townsend* instructs that it must therefore be presumed that Scott's conviction rested upon

nothing more than the least of the acts criminalized by the New York statute of conviction, to

wit, criminal possession of naloxegol with intent to sell. *Townsend*, 897 F.3d at 74 (citing

*Moncrief v. Holder*, 569 U.S. 184, 190-91 (2013)).[7]   The CSA does not prohibit this conduct.

New York's Penal Law, therefore, sweeps more broadly than the generic federal crime under the

CSA, meaning that Mr. Scott's 2006 N.Y.P.L. § 22016. state court conviction cannot qualify as a

---

[6] The analysis with respect to N.Y.P.L. § 220.39(1) (criminal sale of a narcotic drug in the third degree) is, for purposes of the categorical approach's statutory analysis, identical to the analysis with respect to N.Y.P.L. § 220.16(1) (possession of a narcotic drug in the third degree with intent to sell)

[7] Indeed, the substance which Mr. Scott was convicted of possessing is unknown, (PSR at ¶ 27 [referencing Certificate of Disposition]).

predicate offense for career offender calculations. *Id.* (citing *Esquivel-Quintana v. Sessions*, 137 S.Ct. 1562, 1572. (2017)).

There is no valid counterargument that Mr. Scott's 2006 N.Y.P.L. § 220.16 conviction does qualify because his conviction predates the 2015 removal of naloxegol from the CSA. A sentencing court must use the law, including the Guidelines, in effect at the time of sentencing (18 U.S.C. § 3553(a)(4)(A)(ii); USSG § 1B1.11(a)). *See also United States v. Swinton*, 495 F. Supp. 3d 197, 206–07 (W.D.N.Y. 2020) (noting that, "The majority of courts have concluded that a time-of-sentencing approach applies" and collecting cases) (and referencing, *inter alia*, *United States v. Rollins*, Case No. 1:19-cr-00034 [W.D.N.Y. July 1, 2020] [Skretny, J.] [explaining that "[t]he structure of the guidelines is such that [the defendant] be assessed under the current state of the law ... [and] it reasonably follows from that mandate that the sentencing court must also apply the current version of any cross reference or corollary necessary to complete the guidelines calculations, such as the controlled [sub]stances schedules at issue," and therefore applying a time-of-sentencing analysis to defendant's prior convictions under NYPL §§ 220.39(1) and 223.34(1)]; *United States v. Butler*, Case No. 19 Cr. 177, 2020 WL 4677468 (S.D.N.Y. Feb. 12, 2020) (Daniels, J.); *United States v. Gibson*, Case No. 1:19-CR-0066, 2020 WL 1561361 (W.D.N.Y. Jan. 30, 2020) (Vilardo, J.); *United States v. Augustine*, Case No. 17 CR 753 (S.D.N.Y. Sept. 19, 2019) (Seibel, J.);*United States v. Santana*, Case No. 18 cr 865 (S.D.N.Y. Aug. 22, 2019) (Caproni, J.); *but see United States v. Rodriguez*, 18 CR 895 (S.D.N.Y. Sept. 19, 2019) (Kaplan, J.); *United States v. Ferrer*, 17 Cr. 773 (S.D.N.Y. Nov. 16, 2018) (Koeltl, J.) [additional parenthetical references omitted]). Thus, the narrower scope of the CSA in contrast to the New York Penal Law as of Mr. Scott's 2022 sentencing date requires that the

Court conclude that Mr. Scott's 2006 conviction under N.Y.P.L. § 220.16(1) does not qualify as a predicate for purposes of the Career Offender Guideline.

There is yet another basis to conclude that Mr. Scott's 2006 New York Penal Law § 220.16 conviction does not qualify as a career offender predicate. New York Public Health Law § 3306 also criminalizes certain "isomers" of cocaine that the CSA does not. Cocaine includes stereoisomers  (i.e., optical, and geometric isomers) and non-optical, non-geometric isomers (e.g., constitutional, and positional isomers). See *Holmes*, 2022 WL 1036631 at 7 (explaining the numerous types of and subtypes of isomers). Judge Garaufis in *Holmes* conducted a comprehensive review of expert testimony, of the legislative history of Public Health Law § 3306, and of the plain text of § 3306 and concluded that the "New York Law covers non-optical, non-geometric isomers in its definition of isomers of cocaine, whereas the CSA does not." *Id*. at 11.; *accord. United States v. Fernandez-Taveras,* 2021 WL 66485 (E.D.N.Y., Jan. 7, 2021) (Garaufis, J.); *United States v. Baez-Medina*, 20 Cr 24 (S.D.N.Y. (Koeltl, J.); *United States v. Ferrer*, 20 Cr. 650 (S.D.N.Y.) (Buchwald, J). Thus, there can no question that the New York Public Health Law § 3306 sweeps more broadly than the generic federal crime under the CSA. Accordingly, Mr. Scott's 2006 N.Y.P.L. § 220.16 conviction is not a predicate offense under USSG § 4B1.1. *See Townsend*, 879 F.3d at 72.

### C.     Probation's Reliance on *Sadler* Is Misplaced.

In the Addendum to the PSR (page 12), Probation cites *United States v. Sadler*, 765 F.App'x 627 (2d Cir. 2019) in support of its position that Mr. Scott's N.Y.P.L. § 220.16 conviction is a predicate controlled substance offense under USSG § 4B1.2(b). Probation's reliance on *Sadler* is misplaced for several reasons.

First, *Sadler* is a summary order and without any precedential effect.

Second, courts subsequent to *Sadler* maintained that "controlled substance' as used in the career offender guideline refers exclusively to those drugs listed in CSA. *See*, *e.g.*, cases cited above at pg. 12.

Third, the issue before the *Sadle*r court, raised in a *pro se* brief by defendant Brown, was whether the sentencing court had committed plain error by finding that the defendant's prior N.Y.P.L. 220.39(1) conviction constituted a career offender predicate. *Id*. at 630-31. The Court held that the district court had not committed plain error. But the *Sadler* Court did not consider that the New York statute criminalizes naloxegol and cocaine isomers that the CSA does not.

Fourth, the *Sadler* Court did not attempt to reconcile its narrow reading of *Townsend* with the *Townsend* Court's unambiguous statement: "[We] are confident that federal law is the interpretive anchor to resolve the ambiguity at issue here. Any other outcome would allow the Guidelines enhancement to turn on whatever substance 'is illegal under the particular law of the States where the defendant was convicted,' a clear departure from *Jerome*[8] and its progeny." *Townsend*, 897 F.3d at 71 (quoting, *Esquivel-Quintana*, __U.S.__, 137 S.Ct .1562, 1570, 198 L.E.2d 607 (1990)). *Sadler* does not control and Probation erred in its reliance and misled the Court by not alerting the Court to those decisions cited in this brief which are on point and to the contrary.

In short, whether because of New York's inclusion of naloxegol and/or because New York law covers non-optical, non-geometric isomers in its definition of isomers of cocaine which the CSA does not, "there is a mismatch between "narcotic drug" under N.Y.P.L. § 220.16 and controlled substance under the CSA." *Ibid.* Therefore, Mr. Scott's 2006 N.Y.P.L. § 2016(1)

---

[8] *Jerome v. United States*, 318 U.S. 101, 104, 63 S.Ct. 483, 87 L.Ed. 640 (1943) (holding that the application of federal law does not depend on state law unless Congress plainly indicates otherwise)

conviction is not a qualifying controlled substance offenses for purposes of USSG § 4B1.2(a). As

a result, Mr. Scott has no prior qualifying career offender-controlled substance predicate offense.

## II.    Mr. Scott's Attempted Assault Prior Conviction Is Not A Career Offender Predicate.

Mr. Scott's prior conviction for Attempted Assault 2: Injure Person While Confined in a

Correctional Facility (PSR at ¶ 28) (violation of New York Penal Law § 120.05(7)) is not a

qualifying crime of violence. According to USSG § 4B1.2(a):

> (a) The term "crime of violence" means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that—
>
> > (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or
> >
> > (2) is murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm described in 26 U.S.C. § 5845(a) or explosive material as defined in 18 U.S.C. § 841(c).

Although Application Note 1 to § 4B1.2 states that the term "crime of violence"

"include[s] the offenses of aiding and abetting, conspiring, and attempting to commit such

offenses" (USSG § 4B1.2 cmt. n. 1 (U.S. SENTENCING COMM'N 2019)), "the application

notes are *interpretations of*, not *additions to*, the Guidelines themselves; an application note has

no *independent* force." *United States v. Rollins*, 836 F.3d 737 (7th Cir. 2016) (emphasis in

original). However, it is not necessary for this Court to determine whether Mr. Scott's conviction

for attempted assault in the 2nd degree counts as a crime of violence because even the completed

offense of assault in the 2nd degree under New York law is not a crime of violence.

In *United States v. Dobey*, 2019 WL 5205475 (S.D.N.Y. Oct. 16, 2019), the Honorable

Lorna G. Schofield carefully analyzed a defendant's conviction under New York Penal Law

§120.05(7) using the categorical approach because the statute at issue contains "multiple

subsections with varying elements but there is no dispute which subsection the defendant was convicted of violating."[9]

New York Penal Law §120.05(7) provides that "A person is guilty of assault in the second degree when . . . while confined in a correctional facility . . . with intent to cause physical injury to another person, he causes such injury to such person or to a third person . . ." Judge Schofield concluded that § 120.05(7) is not a crime of violence under either the Force Clause or the Enumerated Offense Clause of USSG § 4B1.2(a).

First, under the Force Clause, the Court followed the Second Circuit's practice of analyzing "crime of violence" in the same way as a "violent felony" under the ACCA. *Dobey*, 2019 WL 5205475 at *5 (referencing *Singh v. Barr*, 939 F.3d 457 (2d Cir. 2019), *United States v. Evans*, 924 F.3d 21 (2d Cir. 2019)). The Court concluded that § 120.05(7) is not a crime of violence under the Force Clause because the statute requires the intent only to cause "physical injury," rather than "serious physical injury," and that "the offense can be based on causing any degree of physical injury to another person," *Dobey*, 2019 WL 5205475 at *5; s*ee also Villanueva v. United States*, 893 F.3d 123, 130 n.6 (2d Cir. 2018) (a finding of "serious physical injury," not just "physical injury" "is necessary to make the defendant's offense a 'violent felony.' "). *Compare United States v. Brown*, 2 F.4th 109 (2d Cir. 2021) (concluding that a violation of New York Penal Law § 120.05(1) ["A person is guilty of assault in the second degree when: (1) With intent to cause serious physical injury to another person, he causes such

---

[9] Here, the Defense notes that the PSR states the title of the offense of conviction ("Attempted Assault 2: Injure Person Whole Confined in a Correctional Facility") but does not provide the Penal Law subsection of conviction. Because other subsections of the statute criminalize other conduct that does not fit the PSR's wording, the Defense assumes that Mr. Scott was convicted of violating § 120.05(7). We note, however, that, to the extent the subsection of conviction is not established, the burden is on the Government to prove the offense of conviction through provision of admissible documents. *See*, *e.g.*, *United States v. Green*, 480 F.3d 627, 635 (2d Cir. 2007).

injury to such person or to a third person"] is a crime of violence career offender predicate because it involves causation of "serious physical injury").

Similarly, the *Dobey* Court concluded that § 120.05(7) "is not a crime of violence under the Enumerated Offenses Clause as it does not equate with the generic crime of 'aggravated assault.'" *Dobey*, 2019 WL 5205475, at *5. That is:

> Under the Model Penal Code, aggravated assault occurs when a person "(a) attempts to cause *serious bodily injury* to another, or causes such injury purposely, knowingly or recklessly under circumstances manifesting extreme indifference to the value of human life, or (b) attempts to cause or purposely or knowingly causes *bodily injury to another with a deadly weapon.*" MODEL PENAL CODE § 211.1(2) (emphasis added); *accord Moring v. United States*, 2017 WL 4574491, at *3 (6th Cir. June 8, 2017) (adopting the Model Penal Code definition as the definition of generic aggravated assault for purposes of determining whether a state aggravated assault statute is a predicate offense). The LaFave treatise states that "[i]n all jurisdictions statutes punish, more severely than simple assault, such aggravated assaults as 'assault with intent to murder' (or to kill or rob or rape) and 'assault with a dangerous [or deadly] weapon.' " LaFave § 16.3(d) (alteration in original).[4] The generic definition of aggravated assault thus requires at least an attempt to cause serious bodily injury or an attempt to cause injury with a dangerous weapon. As discussed above, second degree assault under § 120.05(07), does not require either, and therefore does not equate with "aggravated assault" under the Enumerated Offenses Clause.

*Dobey*, 2019 WL 5205475, at *5.

Because the subsection of the second-degree assault statute under which Mr. Scott was convicted does not require the causation of "serious" physical injury, it is, therefore, not a qualifying crime of violence. Mr. Scott's conviction noted in PSR ¶ 28 for Attempted Assault in the 2nd Degree is not a qualifying crime of violence career offender predicate.

Probation errs in relying on *United States v. Tabb*, 949 F.3d 81 (2d Cir. 2020), which analyzes a different subsection of N.Y.P.L. § 120.05. See PSR Add. at pg. 3. As Probation concedes the Second Circuit has not addressed whether N.Y.P.L. § 120.05(7) is a crime of violence as defined under USSG § 4B1.2(a). *Tabb* concerned N.Y.P.L. § 120.05(2) (*Id.* at 86),

the elements of which are easily distinguished from 120.05(7). Section 120.05(2) provides that

an individual is guilty of assault in the second degree when, "With intent to cause physical injury

to another person, he causes such injury to such person or to a third person by means of a deadly

weapon or a dangerous instrument."

In *Tabb*, the Circuit's analysis of § 120.05(2) relied on *Singh v. Barr*, 939 F.3d 457 (2d

Cir. 2019), in which the Circuit noted that the "deadly weapon" and "dangerous instrument"

language in N.Y.P.L. § 120.05(2) "makes obvious that the statute requires the use of violent

force." *Singh*, 939 F.3d at 462. That is, "The deadly weapons listed in NYPL § 10.00(12), when

used with intent to cause physical injury, inherently carry the risk of causing serious physical

injury. And by the statute's own terms, to be a 'dangerous instrument,' an item must be wielded

such that it 'is readily capable of causing death or other serious physical injury.' NYPL §

10.00(13). *Cf. United States v. Ramos*, 892 F.3d 599, 610-11 (3d Cir. 2018) (finding

Pennsylvania's analogous assault statute to be a crime of violence under the elements clause of

the U.S. Sentencing Guidelines)." *Id.* at 462-63. The statutory subsection under which Mr. Scott

was convicted, § 120.05(7), contains no such language and consequently implies no such use of

violent force.

**III.**   **Mr. Scott's Assault in the 1st Degree Conviction Is His Only Qualifying Career Offender Predicate.**

Mr. Scott's conviction for Assault in the 1st Degree: Intent to Cause Serious Injury with

Weapon (PSR at ¶ 29) is his only qualifying crime of violence predicate.[10] New York Penal Law

120.10(1) provides that, "A person is guilty of assault in the first degree when: . . . With intent to

---

[10] Mr. Scott's conviction for Arson in the 2nd Degree in violation of New York Penal Law § 150.15 is combined with his conviction for Assault in the 1st Degree (see PSR at ¶ 29) and is not counted as a separate sentence under USSG § 4B1.2(c).

cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument; . . ." Mr. Scott's conviction, which has an element intent to cause serious physical injury, qualifies as a crime of violence under USSG § 4B1.2(a)(1). *United States v. Brown*, 2 F.4th 109, 111 (2d Cir. 2021) (footnote omitted) (italicization removed).

For these reasons, Mr. Scott has only one qualifying predicate offense and is not a career offender. He should be sentenced without the career offender enhancement.

### THE CAREER OFFENDER GUIDELINE IS FLAWED AND SHOULD NOT BE APPLIED

The Career Offender Guideline is not based on past practices or empirical data and does not account for § 3553(a) factors. The Career Offender Guideline originates in 28 U.S.C. § 994(h) as a directive to the Commission to promulgate a guideline "at or near the statutory maximum" for repeat violent offenders and repeat drug traffickers. *See* 18 U.S.C. § 994(h); *see also* S. Rep. No. 98-225 at 175 (1983).  The Sentencing Commission has conceded that, in developing the Career Offender Guideline, it was not guided by past practices. *See* USSC, *Supplementary Report on the Initial Sentencing Guidelines and Policy Statements* (1987) at 44 (available at www.fd.org/pdf_lib/Supplementary %20Report.pdf).  Instead, the Career Offender Guideline was created as a result of "pressing congressional deadlines."  USSC, *Measuring Recidivism: the Criminal History Computation of the Federal Sentencing Guidelines* (May 2004) at 1-2; *see also A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score*, (Jan. 4, 2005) at 2-4.

Studies indicate that the career offender sentence levels are far above average past sentences (*see* USSC, *Supplementary Report on the Initial Sentencing Guidelines and Policy Statements* (1987) at 44) and have a disparate impact on minority offenders (*see* USSC, *Fifteen*

*Years of Guidelines Sentencing*: *An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* (2004) at 133. The Career Offender Guideline has not been proven to be the deterrent intended. *Id.* at 134. The Guideline, in addition, fails to take into consideration other § 3553(a) factors that are material to sentencing— offender characteristics, the nature of the prior offenses, the circumstances of the prior offense, the sentence imposed for that offense, or the defendant's role in that offense.

Acknowledging the above-described flaws with the Career Offender Guideline and the criminal history computations, application of the Career Offender Guidelines too often results in overly harsh sentences. *See*, *e.g.*, *United States v. Hodges*, 2009 WL 366231 (E.D.N.Y., Feb. 12, 2009) (citing U.S.S.G. § 4A1.3(b)(1)) (application of the Career Offender Guideline can easily result in a sentence "far [in] excess of what may be necessary to deter recidivism."). In consideration of an offender's individual characteristics under 18 U.S.C. § 3553(a), sentencing courts have imposed sentences below the Career Offender Guideline, both in terms of a departure and as a variance. *See*, *e.g.*, *United States v. Hodges*, 2009 WL 366231 (E.D.N.Y., Feb. 12, 2009) (citing U.S.S.G. § 4A1.3(b)(1)), *United States v. Castello*, 2007 WL 582749 (S.D.N.Y. Feb. 26, 2007) (unreported); *United States v. Serrano*, 2005 WL 1214314 (S.D.N.Y. May 19, 2005) (unreported). Even before the Supreme Court's decision in *Booker* made the Guidelines advisory rather than mandatory, the Second Circuit agreed that the Guidelines' computation of criminal history category could lead to erroneous results. *See United States v. Mishoe*, 241 F.3d 214, 218-220 (2d Cir 2001) (in addressing Government's appeal from a district court's sentence which departed from the career offender provision, the Circuit acknowledged that, "in some cases the numerical formula by which points for prior sentences of different severity determine the applicable CHC might result in a sentencing range that was either too lenient or too severe.");

*see also United States v. Rivers*, 50 F.3d 1126, 1130-31 (2d Cir. 1995) ("We ... agree that in the case of a defendant whose offense level is raised by his criminal history into career offender status, ... [the court's] discretion may be exercised, to the extent thought appropriate, to reduce either the criminal history category or the offense level, or both.").  Accordingly, under *Kimbrough*, *Gall*, *Nelson*, and their progeny, the sentencing court is free to vary from the Career Offender Guideline. *See Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (whatever deference is due to a guideline depends heavily on whether the Commission acted in "the exercise of its characteristic institutional role."); *Gall v. United States*, 552 U.S. 38, 46 & n. 2 (2007); *Nelson v. United States*, 555 U.S. 350 (2009).

 In Mr. Scott's case, application of the Career Offender Guideline would result in an overly harsh sentence that is contrary to the parsimony clause of 18 U.S.C. § 3553(a) and would not meet the statutory goals of sentencing. All but one of his felony convictions occurred when Mr. Scott was in his early twenties. See PSR ¶ 24 (age 20), ¶ 25 (age 21), ¶ 26 (age 21), ¶ 27 (age 21), ¶ 28 (age 24). We are cognizant that Mr. Scott does have a substantial criminal history, but in light of his age when he committed these offenses, his record must be viewed through an understanding of the adolescent brain.

The adolescent brain normally does not reach full maturity until sometime in the twenties when the frontal lobes of the brain reach full maturity, particularly the prefrontal cortex which is that area of the brain that is concerned with "executive" functions, enabling us to prioritize thoughts, imagine, think in the abstract, anticipate consequences and control impulses. *See* Adolescence, Brain Development and Legal Culpability, ABA Juvenile Justice Center, January, 2004; Frances Jensen, M.D. & Amy Ellis Nutt (2015), *The Teenage Brain*. Harper, New York; Daniel M. Segal, M.D. (2015) *Brainstorm: The Power and Purpose of The Teenage Brain.*

Tarcher/Penguin, New York. Consequently, adolescents and young adults (ages 20-27) are less capable of controlling their impulses, exercising self-regulation, assessing, and avoiding risk, and rationally considering alternative outcomes of their behavior. They are unable to consider the consequences of their actions, compared to adults, and they are more susceptible to their peers' negative influences.

Mr. Scott's adolescent impulsivity and inability to rationally evaluate the consequences of his actions was made worse by his heroin addiction, which provided the impetus for his four narcotics offenses at age 21 (over 17 years ago). Mr. Scott used heroin, cocaine, marijuana, and alcohol beginning in his teens. See PSR at ¶ 44. It was his own addiction to heroin that reared its ugly head in 2019 and 2020 when Mr. Scott was overwhelmed with work, school, and then with the trauma related to the Pandemic.

While out on bond, Mr. Scott sought treatment and had consistent negative drug tests. See PSR ¶¶ 29, 44. The convictions that the Defense argues are not qualifying predicate offenses occurred in 2006 and 2008 (PSR ¶¶ 27, 28). And even Mr. Scott's single valid career offender predicate (PSR ¶ 29) occurred in 2013, nearly a decade ago. It is evident that Mr. Scott is maturing, seeking treatment for his addictions, and on the right path.

On March 7, 2022, the Court remanded Mr. Scott for violating what the Court assumed was an active protective order in favor of the victim of the 2013 assault. At the bond revocation hearing, Mr. Scott admitted that he had visited the neighborhood where he thought the victim of the 2013 assault resided. He explained that he understood the protective order had expired. He sought only to take a picture of the victim to bring to a Voodoo priestess to eradicate the Voodoo curse Mr. Scott understands the victim placed upon him due to the victim's unfounded belief that Mr. Scott was having an affair with his wife.

It appears that Mr. Scott was correct regarding the lapse of the protective order. A review of Mr. Scott's "rap sheet" reveals that a protective order was issued in 2013 for a period of eight years. Another protective order was not produced to Your Honor, to the undersigned, or, to the best of counsel's understanding, to Mr. Scott. Notably, Parole did not seek any action against Mr. Scott, nor did Pretrial Services. The evidence available is that the protective order expired in 2020. Mr. Scott was not armed and there was not even a suggestion that Mr. Scott intended to do any physical harm to the victim or even speak to him. Rather, Mr. Scott remained on a public street, in front of his parked car, and used his cellphone which he had in his hand to take pictures of the area in the hope this would be sufficient for the Voodoo priestess to erase the curse that he believes is the source of all of his problems.

But most importantly, Mr. Scott is not the same person he was a decade ago. He has demonstrated success in overcoming his addiction and a desire to become a productive member of his community. He worked the entire time he was on bond (6 days a week for 10-hour days) and received praise from his employer. See Exhibit B, Letter from Oleg Batuner of ACT Ambulette ("Mr. Scott showed himself as a great employee. Always showed up to work on time, did not miss any working days, and show[ed] great respect to his fellow workers."). He attended college and plans to pursue a higher education degree. He has goals for his future, a supportive partner and family to whom he will return, and a faith community on which he can draw for strength while he is incarcerated.

Without the career offender enhancement, even in CHC VI, Mr. Scott's offense level of 15 equates to an advisory Sentencing Guidelines range of 41-51 months of imprisonment. A career offender-length sentence of 151-188 months is simply not necessary to serve the goals of

§ 3553(a) for Mr. Scott. A sentence of 24 months, on the other hand, meets all the goals of sentencing.

### A SENTENCE OF 24 MONTHS WOULD SERVE EACH OF THE GOALS OF SENTENCING

Mr. Scott is not the first individual to have struggled with the trauma of a dysfunctional background, the stress associated with working and school, and the isolation and stress of the COVID-19 pandemic. Nor is he the first (or the last) to have relapsed into drug addiction to self-medicate or to counter that stress. In fact, researchers at the National Institute on Drug Abuse "have observed increases in substance use and drug overdoses in the United States since the COVID-19 pandemic was declared a national emergency in March 2020."  National Institute on Drug Abuse, "COVID-19 & Substance Use" (available at:  https://nida.nih.gov/drug-topics/comorbidity/covid-19-substance-use). "Social isolation and pandemic-related stress are likely contributing factors to increases in substance use and poor substance use outcomes." *Id.* (under FAQ: Are people using drugs more during the COVID-19 pandemic?).

Mr. Scott has admitted his relapse and has accepted full responsibility for having sold heroin to undercover agents in order to fund his own addiction. See Exhibit A. He knows that he was on the wrong path. Since his arrest he has worked hard to put himself on a better one by working steadily and by attending college classes. All of these good characteristics and positive developments in Mr. Scott's life counsel in favor of a relatively short term of imprisonment. *See United States v. Maier*, 975 F.2d 944 (2d Cir. 1992) (discussing post-plea rehabilitation as a permissible ground for a sentencing departure). Thus, although the sale of narcotic drugs is a serious offense, a non-Guidelines term of imprisonment would provide just punishment while recognizing the impact of unusual external stressors on his offense conduct.

With respect to the need for deterrence, protection of the public, and the need for education, vocational training, or medical care, we ask the Court to consider that Mr. Scott has already demonstrated the potential to turn his life fully around. He is a hard worker, as letters from family and friends attest. His instructor in an Introduction to Psychology class described him in glowing terms:

> Mr. Scott submitted all assignments and maintained an A grade average. His attendance at class meetings, which were held on Zoom because of COVID-19 restrictions, was excellent. His contributions to discussions were always fair and thoughtful. If I asked a question and no other student responded, I knew I could count on Alonzo for a helpful response. He modeled good conduct in simple ways . . . He was always willing to ask questions and make comments that would benefit his classmates too – a testament to his generous nature and leadership qualities. . . . Within this learning community, Mr. Scott was an excellent role model for his peers.

Exhibit B, Letter from Roderick Hurley.

With continued support, and with an opportunity to take advantage of BOP programming—which the Defense notes has been minimal during the past two years due to COVID-related lockdowns--, Mr. Scott will be able to reach his educational goals and realize his potential. As his pastor writes, Mr. Scott is an individual "that can profit from remaining in the community with adequate resources. [He is a] loving, kindhearted man who made a mistake, and understands the ramifications" Exhibit B, Letter from Dr. Rev. Marcia Herrera, LMSW. He has "used [his] faith as a primary place of instructions and guidance on how to be [a] better human being[]." *Id.* And his significant other, Latoya Hill, confirms that Mr. Scott is working hard to earn his second chance. Exhibit B, Letter from Latoya Hill ("He is a loving kindhearted man who would like a second chance at life, and to be a father figure to my twins' and for us to create a life together.")

In furtherance of these goals, the Defense asks the Court to recommend Mr. Scott for participation in RDAP and in any other programs of counseling or treatment that BOP evaluation finds to be appropriate. As noted during the hearing on March 7, 2022, Mr. Scott believes that a Voodoo hex has been placed on him. Voodoo is an African-derived religion with roots in ancient rituals of spirit worship and sacrifice. Although often sensationalized by media portrayals and poorly understood, Voodoo centers around the community as family and around honoring the ancestors and the Voodoo gods. *See*, *e.g.*, "The Power of Voodoo: Voodoo's Effect on the Haitian African Diaspora" (available at: https://www.csuci.edu/writing-ci/guide/samples/documents/histanthrosample2.pdf). Mr. Scott believes the curse is a cloud hanging over him. That is the extent of his Voodoo involvement. He has not engaged in any controversial rituals.

The Supreme Court has instructed that "a court may not impose or lengthen a prison sentence to enable an offender to complete a treatment program or otherwise to promote rehabilitation." *Tapia v. United States*, 564 U.S. 319, 335, 131 S. Ct. 2382, 2393, 180 L. Ed. 2d 357 (2011). Thus, although we recognize that Mr. Scott might benefit from the RDAP program and from additional counseling or treatment programs to assist him with his concerns, we do not ask the Court to impose a sentence of incarceration specifically so that Mr. Scott will be eligible for participation. Rather, we ask the Court to recommend that the BOP consider Mr. Scott for any and all treatment and counseling programs for which he may be eligible, and to place him in an appropriate facility where he may take advantage of those opportunities.

The best way to protect the public and to ensure that Mr. Scott does not recidivate is to give him hope for the future and meaningful skills. We suggest that a sentence of 24 months accomplishes those goals.

Finally, we note that the COVID pandemic and the related lockdowns within BOP facilities will make any term of incarceration that the Court imposes harsher and more punitive than it would be under usual circumstances. Mr. Scott will be at greater risk of COVID infection than he would be at home. Indeed, it has been well established that conditions of imprisonment create the ideal environment for the transmission of contagious diseases. See Joseph A. Bick, *Infection Control in Jails and Prisons*, 45 CLINICAL INFECTIOUS DISEASES 1047, 1047 (2007), https://doi.org/10.1086/521910. "Incarcerated/detained persons live, work, eat, study, and recreate within congregate environments, heightening the potential for COVID-19 to spread once introduced." Centers for Disease Control and Prevention (CDC), *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html; see also Keri Blakinger & Beth Schwarzapfel, *How Can Prisons Contain Coronavirus When Purell is a Contraband?*, ABA JOURNAL (Mar. 13, 2020); https://www.abajournal.com/news/article/when-purell-is-contraband-how-can-prisons-contain-coronavirus.

Further, BOP lockdowns and programming limitations will make it harder for Mr. Scott to accomplish his treatment and educational goals. See BOP.gov "COVID-19 Modified Operations Plan & Matrix" (available at: https://www.bop.gov/coronavirus/covid19_modified_operations_guide.jsp) (noting that institutional programming may be modified or even suspended in facilities with high rates of COVID transmission). A relatively short sentence followed by a period of supervised release would afford Mr. Scott access to necessary programs—schooling, drug treatment, mental health

counseling— and enable him to work, which in and of itself is crucial to his wellbeing and his continued road to rehabilitation.

## **CONCLUSION**

In sum, Mr. Scott is not a career offender and should be sentenced without regard to that enhancement. We ask the Court to impose a sentence that acknowledges the external factors that played a role in his admitted offense conduct, recognizes Mr. Scott's positive steps toward rehabilitation, and gives him hope for the future. Such a sentence—a term of imprisonment of 24 months—would be sufficient, but not greater than necessary, to serve all of the goals of sentencing.

We thank the Court for its consideration of this memorandum.

Dated: April 26, 2022
      New York, NY

                                      _____/s/_____
                                        Donna R. Newman, Esq.
                                        Law Office of Donna R. Newman, PA
                                        20 Vesey St., Ste. 400
                                        New York, NY 10007
                                        (212) 229-1516

                                        *Attorney for Alonzo Scott*

Cc:    All counsel (by ECF)
        Mr. Alonzo Scott (by mail)